IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| D.S., by and through his mother, Clarenore S., Plaintiffs, vs. DEPARTMENT OF EDUCATION, State of Hawaiʻi, Defendant. | CIVIL NO. 12-00533 DKW/RLP ORDER REVERSING ADMINISTRATIVE HEARINGS OFFICER'S AUGUST 31, 2012 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION AND GRANTING PLAINTIFFS' MOTION FOR STAY PUT |

**ORDER REVERSING ADMINISTRATIVE HEARINGS OFFICER'S AUGUST 31, 2012 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION AND GRANTING PLAINTIFFS' MOTION FOR STAY PUT**

**INTRODUCTION**

Before the Court is Plaintiffs David S. ("Student"), by and through his

Parent, Clarenore S.'s (collectively, "Plaintiffs") appeal from the Administrative

Hearings Officer's ("Hearings Officer") August 31, 2012 Findings of Fact,

Conclusions of Law and Decision ("Decision"), pursuant to the Individuals with

Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq*.   Also

before the Court is Plaintiffs' Motion for Stay Put, pursuant to 20 U.S.C. § 1415(j).

On July 19, 2013, the Court heard oral arguments on the appeal and the Motion for

Stay Put.    After careful consideration of the supporting and opposing memoranda, the administrative record, and the arguments of counsel, the August 31, 2012 Decision is REVERSED.    Plaintiffs' Motion for Stay Put is GRANTED.

## **BACKGROUND**

Student, a fifteen-year-old minor, was diagnosed with autism when he was five years old.    Since that time, Student has received special education services.    There is no dispute that Plaintiffs unilaterally placed Student at Loveland Academy ("Loveland"), a private facility, beginning in 2006.    Student has continuously attended Loveland since 2006.    The present appeal relates directly to Student's February 2, 2011 ("February IEP") and May 31, 2011 ("May IEP") individualized education programs ("IEP").    Petitioner's ("Pet.") Exs. 4, 2.

This is not the first appeal to this Court that seeks a review of an administrative hearings officer's decision related to an IEP for Student.    The extensive factual history prior to this appeal can be found in the following two orders by Magistrate Judge Kurren in *D.S. v. Haw. Dep't of Educ.*, Civ. No. 10-00053 BMK:    1) *Order Affirming in Part, Reversing in Part, and Remanding the Administrative Hearings Officer's Decision* (April 1, 2011) ("2011 Appeal Order"); and 2) *Amended Order Granting Plaintiff's Motion for Stay Put* (August

9, 2012) ("2012 Stay Put Order").   Only the facts directly pertinent to this appeal are briefly recounted here.

## I.   Behavior Assessments and IEPs

Student has many severe behavioral and mental health issues. Relevant here, Student developed newly sexualized behaviors in 2009 and 2010. Student's Intensive Instruction Services Coordinator ("IISC") at Loveland, Nichole Rowles, described the development of these behaviors:

> In 2009 he started doing more sexualized behavior, but they really surfaced in 2010.   In 2010 he had done things like grabbing women's breasts, kissing women, just randomly as he would walk by.   Female skills trainers, that's what I mean by women.
> He has punched.   He's poured water on top of students, like over their heads.   He's had violent tantrums.   He has flashed his genitals.   He has taken off all of his clothes in the bathroom while another person is entering.

Hearing Tr. Vol. I at 184:18–185:3.

As a result of these and other behaviors, beginning in May 2010, Parents requested that the Department of Education, State of Hawaiʻi ("DOE") conduct three assessments of Student:    (1) a Behavior Optometry Assessment; (2) a Neuropsychological Assessment; and (3) an Emotional Behavior Assessment ("EBA").   Decision at 12 ¶ 20.   Parents temporarily withdrew the request for these assessments but renewed the request again in September 2010.   Following a

3

meeting on the proposed assessments, the DOE issued a Prior Written Notice

("PWN") on September 28, 2010, declining to conduct the Behavior Optometry

Assessment and the Neuropsychological Assessment, but agreeing to conduct the

EBA.   In declining to conduct the Neuropsychological Assessment specifically,

the DOE explained:

> The DOE declines conducting a Neuropsychological
> Assessment because the DOE has all of the components of the
> neurological assessment (cognitive scores with processing
> scores), [and] speech language assessment.   The DOE is
> able to use this information to determine areas of strengths that
> they can incorporate in teaching and areas of weakness that
> would need to [be] supported when teaching.   Based on the
> information the parties have up to this date the DOE is able to
> implement an offer of FAPE.   A second reason the DOE
> declines the assessment is that there has been no recent
> traumatic events which would make the information available
> invalid.   Therefore a neuropsychological assessment would
> not be appropriate at this time.

Respondent's ("Resp.") Ex. 20 (September 28, 2010 PWN) at 100.   Ultimately,

the EBA was also not conducted because Parents did not give their consent to the

EBA in a timely fashion.   Resp. Ex. 22 (February 18, 2011 PWN).   Parents

apparently did not consent because they were waiting for the results of a

neuropsychological assessment, which they completed at their own expense when

the DOE refused to conduct one.   Hearing Tr. Vol. IV at 750:20–753:5.

On January 26, 2011, an IEP meeting for Student was held.

Student's IISC, Ms. Rowles, attended that IEP meeting.   At that meeting, she

described to the IEP team the new sexual behaviors that Student had developed

beginning in late 2009 and throughout 2010.   Specifically, Ms. Rowles testified:

> I told [the IEP team] that he has had newer behaviors, that he
> has groped women's breasts, he has shown body parts, he has --
> I think I also told them about the phone calls that he has made
> towards a female skills trainer, and he also had this obsession
> with one, to date a female skills trainer.   So I told them about
> that.

Hearing Tr. Vol. I at 211:21–212:2; Decision at 16 ¶ 29.   Ms. Matsuura, the DOE

care coordinator for Student, admitted that Ms. Rowles conveyed information

about these new behaviors to the IEP team at that meeting.   Hearing Tr. Vol. IV at

741:17–742:2.   Because it was not fully completed on January 26, the IEP

meeting was reconvened and the IEP was completed on February 2, 2011.

The Present Levels of Educational Performance ("PLEPs") section of

the February IEP explicitly relied on the behavioral assessments conducted by

Loveland in October 2009.   Pet. Ex. 4 at 00039.   Because Student's new

sexualized behaviors had not manifested at the time of these 2009 assessments, a

parenthetical was included in the PLEPs for the February IEP:   "(Loveland IISC

added:   Sometimes specific people [] trigger [Student.]   It was clarified that they

5

are usually adult females.    This is a newer behavior.)"    *Id.*    However, the February IEP did not otherwise address the new sexualized behaviors.

In May 2011, another IEP meeting was held solely to address parent training needs.    Decision at 18–19 ¶ 41; Pet. Ex. 42 (June 22, 2011 Letter) at 000365.    There is no dispute, and the Hearings Officer found, that the May IEP is identical to the February IEP.    Decision at 18–19 ¶ 41; Hearings Tr. Vol. IV at 749:18–20.

## II.   <u>Settlements and Stay Put Payments</u>

Through settlement agreements, the DOE paid for Student's attendance at Loveland for the 2006–2007 and 2007–2008 school years.    As a result of the 2011 Appeal Order, the DOE was additionally ordered to pay for Student's attendance at Loveland for the 2008–09 and the 2009–2010 school years at a 30 percent reduced rate.

In the 2012 Stay Put Order, Judge Kurren ordered the DOE to make stay put payments through the conclusion of the remand proceedings in that case. As a result of that order, the DOE has paid Loveland for the period covering Student's attendance up until September 2012.    Declaration of Maurolyn Gurtiza ("Gurtiza Decl.") ¶ 4 (stating that the DOE "has not paid for D.S.'s special

education and related mental health services from September 2012, through the

present"); *see* Declaration of Wade Okuma ("Okuma Decl.") ¶¶ 14-15.

## III.   __Due Process Hearing and Appeal__

On November 15, 2011, Plaintiffs sent to the DOE a request for an

impartial due process hearing, asserting that Student was denied a free appropriate

public education ("FAPE") through the February IEP and the May IEP.    Pet.

Ex. 1 (Due Process Request).    The request states, in relevant part:

> The DOE has not provided an appropriate offer of FAPE to the
> [Student].   Many of [Student's] needs revolve around his
> emotional/behavioral and psychological deficits.   The DOE
> has failed to timely and properly evaluate and/or address his
> complex psychological or mental health needs, and denied
> Petitioners' request for a comprehensive psychological
> evaluation and/or a neuropsychological evaluation.
> [Student's] annual IEP of February 2, 2011 [w]as not conducted
> or concluded in a timely manner, and the IEPs of February 2,
> 2011 and May 22, 2011 do not provide any transfer plan for
> moving [Student] from Loveland Academy into an appropriate
> DOE classroom or environment.    The IEPs do not adequately
> i[]dentify all of [Student's] strengths and needs, fails to provide
> appropriate goals and objectives to meet his deficits, and fails to
> offer appropriate levels of needed services, to address his
> specific speech, occupational therapy (OT) and mental health
> deficits.

Pet. Ex. 1 (Due Process Request).    A due process hearing was held on March 28–

30 and April 25, 2012.    In its Decision, the Hearings Officer rejected each of the

grounds asserted in Plaintiffs' due process request.    Plaintiffs' appeal of that

decision is presently before the Court.

## STANDARD OF REVIEW

### I.    IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on

disabled students a substantive right to public education and providing financial

assistance to enable states to meet their educational needs."    *Hoeft ex rel. Hoeft v.*

*Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v.*

*Doe*, 484 U.S. 305, 310 (1988)).    It ensures that "all children with disabilities

have available to them a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare

them for further education, employment, and independent living[.]"    20 U.S.C.

§ 1400(d)(1)(A).    The IDEA defines FAPE as special education and related

services that—

> (A) have been provided at public expense, under public supervision
> and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary
> school education in the State involved; and
> (D) are provided in conformity with the individualized education
> program required under section 1414(d) of this title.

8

20 U.S.C. § 1401(9).    To provide a FAPE in compliance with the IDEA, a state

educational agency receiving federal funds must evaluate a student, determine

whether that student is eligible for special education, and formulate and implement

an IEP.    20 U.S.C. § 1414.    The IEP is to be developed by an "IEP Team"

composed of, *inter alia*, school officials, parents, teachers and other persons

knowledgeable about the child.    20 U.S.C. § 1414(d)(1)(B).

  "Procedural flaws in the IEP process do not always amount to the

denial of a FAPE."    *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th

Cir. 2009) (citations omitted).    Once a procedural violation of the IDEA is

identified, the court "must determine whether that violation affected the

substantive rights of the parent or child."    *Id.* (citations omitted).    "[P]rocedural

inadequacies that result in the loss of educational opportunity, or seriously infringe

the parents' opportunity to participate in the IEP formulation process, clearly result

in the denial of a FAPE."    *Id.* (alteration in original) (citations and quotation

marks omitted).

  Compliance with the IDEA does not require school districts to provide

the "absolutely best" or "potential-maximizing" education.    *J.W. v. Fresno*

*Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal

quotation marks omitted).    Rather, school districts are required to provide only a

"'basic floor of opportunity.'"   *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982)).   The FAPE need only be "appropriately designed and implemented so as to convey [the][s]tudent with a meaningful benefit."   *Id.* at 433 (citations and quotation marks omitted).

## II.   <u>Standard of Review</u>

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court—
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings.   *Capistrano*, 556 F.3d at 908 (quoting *Rowley*, 458 U.S. at 206) (some citations omitted).   The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling.   *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).   In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference

10

where said findings are "'thorough and careful.'" *Capistrano*, 556 F.3d at 908 (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court should give "substantial weight" to the hearings officer's decision when the decision "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466–67 (9th Cir. 1996) (citation and quotation marks omitted). Such deference is appropriate because "if the district court tried the case anew, the work of the hearing officer would not receive 'due weight,' and would be largely wasted." *Wartenberg*, 59 F.3d at 891. "[T]he ultimate determination of whether an IEP was appropriate," however, "is reviewed de novo." *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (citing Wartenberg, 59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative decisions is twofold:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? [*Rowley*, 458 U.S. at 206–07] (footnotes omitted). If these requirements are met, the State has

complied with the obligations imposed by Congress and the courts can require no more.   *Id.* at 207.

*J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling.   *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted).   The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed.   *J.W.*, 626 F.3d at 438 (citation omitted).

## DISCUSSION

The Court concludes that the Hearings Officer incorrectly determined that the February and May IEPs provided Student a FAPE.   Accordingly, the Court reverses the Hearings Officer's Decision.   In addition, the 2011 Appeal Order and 2012 Stay Put order established Student's current educational placement at Loveland.   Thus, the Motion for Stay Put is granted.   The Court addresses each issue in turn.

## I.   Appeal of the August 31, 2012 Decision

Plaintiffs contend that Student was denied a FAPE through the February and May IEPs because, among other things, the PLEPs did not address

Student's *current* mental health issues and needs.    The DOE counters that it had no idea at the time of the IEP meetings that the information it was relying on was stale.    The Hearings Officer noted that "one of Student's mental health concerns is his escalating behaviors," but seemingly concluded that there was no denial of FAPE because the February and May IEPs were developed based on the information that the IEP team had at the time.    Decision at 32.

The Court concludes that Student was denied a FAPE because the February and May IEPs did not consider the most recent information available to the DOE about Student's behavioral issues; namely, the new behaviors that surfaced in late 2009 and throughout 2010 that the DOE was made aware of prior to the development of Student's 2011 IEPs.    Because this information was not considered, Student's IEP could not have been reasonably calculated to enable Student to receive the educational benefits to which he was entitled.

The DOE contends that it was not made aware of Student's escalating sexual behaviors until December 2011.    Hearing Tr. Vol. IV at 643:3–644:11. The testimony of Ms. Rowles, however, indicates that she attended the January 26, 2011 IEP meeting in which she explained to the IEP team that Student was displaying new sexualized behaviors that should be addressed.    Hearing Tr. Vol. I at 209:2–212:21.    The DOE's own care coordinator for Student admitted that Ms.

Rowles commented on these new behaviors.    Hearing Tr. Vol. IV at 741:17–

742:2.    The PLEPs made note of Ms. Rowles's comments, but only referred to "a

newer behavior" that was triggered by females without any mention of the several

specific sexual behaviors that Ms. Rowles described to the IEP team.    Pet. Ex. 4

(February IEP) at 00039.    Ms. Rowles also stated that Loveland had revised its

behavioral goals for Student prior to January 2011 to reflect the sexualized

behaviors that had been going on throughout 2010.

            Consequently, while the information provided by Loveland to the

DOE at (and prior to) the January IEP meeting was not extensive with regard to

Student's new behaviors, the information was sufficiently conveyed.    As a result,

the Court disagrees with the Hearing's Officer's determination that it was

"disingenuous" of Plaintiffs and Loveland to not provide necessary information

and feedback to develop an appropriate IEP.    Decision at 32.    To the contrary,

the evidence indicates that the specific information related to Student's new

problematic behaviors was conveyed.    In fact, the Hearings Officer noted that the

DOE was informed of Student's "newer sexualized behaviors."    Decision at 31.

This information should have been fully implemented into the February and May

IEP, but was not.

Although the PLEPs mention that there are some "newer behavior[s]," the IEP does not actually describe those behaviors nor does it provide any goal or objective to address these behaviors.   In short, the DOE was on notice that Student was displaying some very troubling sexualized behaviors that were not previously present in Student's behavior profile.   It was not objectively reasonable to disregard this information and neglect to incorporate a plan to address these new behaviors within the IEP.   *See J.W. v. Fresno Unified. Sch. Dist.*, 626 F.3d 431, 439 ("'In striving for "appropriateness," an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is at the time the IEP was drafted.'"   (quoting *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999))).   Thus, the February and May IEPs were not reasonably calculated to provide Student with educational benefits, and the Hearings Officer improperly determined that the preponderance of the evidence indicated that Student was offered a FAPE through the February and May IEPs' treatment of Student's mental health and behavior issues.[1]

_____

[1]  This is not the first time that the DOE has relied on outdated information to draft an IEP for Student.   In the 2011 Appeal Order, Judge Kurren concluded there was a denial of FAPE because, among other things, the 2009 IEPs did not reflect Student's present level of achievement and performance and the PLEPs were based on outdated information from the previous year.   2011 Appeal Order at 29–32.

Additionally, the DOE may not pass responsibility off to Loveland and Parents for not updating the dated assessments that the DOE relied on to develop the PLEPs and IEPs.   As the Plaintiffs correctly point out in their briefing:

> The Individuals with Disabilities Education Act ("IDEA") mandates that public educational agencies review and revise annually an eligible child's IEP.   20 U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1).   Neither the IDEA nor its implementing regulations condition this—or any other—duty expressly imposed on a state or local educational agency upon parental cooperation or acquiescence in the agency's preferred course of action.

*Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1051 (9th Cir. 2012).   Despite this obligation, the DOE relied on Loveland's behavioral assessments from 2009 for the February and May IEPs.   Curiously, at the time of the February and May IEPs, the DOE had access to (but did not rely on) a behavioral assessment done by a DOE psychologist in 2010, six months after the 2009 behavioral assessment relied on in the IEPs.   Resp. Ex. 41 (March 31, 2010 Behavior Assessment). The DOE has not established that it made a legitimate effort to access more current information on Student's behavior, despite its statutory and regulatory mandate and the DOE's own policy and understanding that "behaviors may not be the same if it's a year or two later."   Hearing Tr. Vol. IV at 752:3–4; Decision at 20 n.20.

16

This is also not a case where the DOE's failures might be excused because parental concerns were never expressed or information was not provided. *See DOE v. C.B.*, 2012 WL 1537454, at *11 (D. Haw. May 1, 2012) ("The court declines to place upon a school the burden of recognizing a parent's concern about the inadequacy of a school's response to the parent's inquiry when the parent has given no indication of concern."). Instead, as noted above, the DOE *was* placed on notice of new behaviors by Student that had emerged since the 2009 assessments that the DOE was relying on. At that point, the DOE was obligated to investigate further into the scope of these behaviors (with or without additional cooperation from Parents or Loveland) in order to develop an adequate IEP, even if the initial report may have indicated those behaviors were directed only at certain individuals. *Marc M. v. DOE*, 762 F. Supp. 2d 1235, 1244–45 (D. Haw. 2011). The Hearings Officer overlooked that obligation and incorrectly determined that the IEP team considered "current behavior information." Decision at 32. The Court concludes that the February and May IEPS were thus not reasonably calculated to enable Student to receive educational benefits. *Rowley*, 458 U.S. at 206–207. The Court reverses the Decision based on this substantive denial of FAPE. *See Anchorage Sch. Dist.*, 689 F.3d at 1051; *id.* at 1058 ("[T]he outdated IEP does not satisfy the *Rowley* 'educational benefit' standard.").

Plaintiffs also contend that the IEPs did not provide Student a FAPE because the IEPs did not have adequate speech and occupational therapy goals. The DOE's only argument to the contrary was that Plaintiffs failed to raise these issues in the due process request before the Hearings Officer and therefore waived them.   However, Plaintiffs' Due Process Request (which the DOE cites) states:

> The IEPs do not adequately i[]dentify all of [Student's] strengths and needs, fail[] to provide appropriate goals and objectives to meet his deficits, and fail[] to offer appropriate levels of needed services, to address his specific speech, occupational therapy (OT) and mental health deficits.

Resp. Ex. 1 (Due Process Request) at 000004.   Clearly, Plaintiffs' due process request fairly raised these specific concerns.

Additionally, the DOE did not rebut Plaintiffs' evidence at the hearing that the speech goals were based on outdated data from 2009 and that Student's occupational therapy needs were not met at all.   Hearing Tr. Vol. II at 393:5–395:1; Vol. I at 214:4–24.   Thus, the uncontroverted evidence indicates that the goals and objectives relating to Student's speech and occupational therapy needs were not adequate.   This additionally demonstrates that the February and May IEPs were not reasonably calculated to enable Student to receive educational benefits.   *See Anchorage Sch. Dist.*, 689 F.3d at 1058 (holding that there was a

substantive denial of a FAPE where the school relied on an "outdated and obsolete" IEP from the student's previous school year).

Given that the Court concludes that there was a substantive denial of a FAPE in the February and May IEPs, the Court need not address the procedural claims related to Parents' request for a neuropsychological exam.    The Court notes, however, that Plaintiffs candidly admitted that the neuropsychological exam that they commissioned and paid for, after the DOE refused to do one, did not reveal any information that would have justified a modification of the PLEPs or 2011 IEPs.

## II.    <u>Reimbursement and Stay Put</u>

Having found a denial of FAPE, the Court has discretion to "grant such relief as the court determines is appropriate."    20 U.S.C. § 1415(i)(2)(C)(iii). This relief may include "'reimbursement for the cost of providing an appropriate education.'"    *Anchorage Sch. Dist.*, 689 F.3d at 1058 (quoting *W.G. v. Target Range Sch. Dist.*, 960 F.2d 1479, 1485 (9th Cir. 1992)).

There is no dispute that the DOE has paid for Student's special education and related mental health services up until September 12, 2012 as a result of the orders by Judge Kurren in the previous appeal involving these parties. Gurtiza Decl. ¶ 4; *see* 2012 Stay Put Order at 11 (ordering the DOE to pay stay put

19

to maintain Student's placement at Loveland through the conclusion of

proceedings in that case).    Consequently, the DOE has already paid for the time

period covered by the February and May IEPs in which the Court now holds

Student was denied a FAPE, and there is no further amount for the DOE to

reimburse for that period.    Pet. Ex. 4 (February IEP) at 00057 (listing the services

beginning date as February 2, 2011 and the ending date as January 25, 2012).

The Court, therefore, orders no additional reimbursement and does not address the

DOE's contention that reimbursement is barred by the statute of limitations.

       Plaintiffs also seek stay put payments from September 12, 2012

(apparently the point where the DOE stopped paying for Student's special

education and mental health services at Loveland) through the conclusion of this

case.    Motion at 4.[2]    The stay put provision of the IDEA provides:

> Except as provided in subsection (k)(4), during the pendency of
> any proceedings conducted pursuant to this section, unless the
> State or local educational agency and the parents otherwise
> agree, the child shall remain in the then-current educational
> placement of the child, or, if applying for initial admission to a
> public school, shall, with the consent of the parents, be placed

---

[2]  Although the second page of the Motion states that Plaintiffs seek payment from November 15, 2011 to the present, this appears to be a typographical error as the Memorandum in Support indicates that Plaintiffs are seeking payment from September 12, 2012 to the present, Motion at 4, and the declaration of Loveland's billing administrator also states that DOE payments stopped in September 2012.    Gurtiza Decl. ¶ 4; *see* Okuma Decl. ¶¶ 14-15.

in the public school program until all such proceedings have
been completed.

20 U.S.C. § 1415(j).   Although the statute itself does not speak of payment or

reimbursement, the Ninth Circuit has interpreted the stay put provision as requiring

a school district to fund the child's "then-current educational placement" at a

private school, when applicable, during the pendency of any administrative or

judicial proceedings under the IDEA.   *See Clovis Unified Sch. Dist. v. Cal. Office*

*of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir. 1990) (per curiam).

        The IDEA does not define the phrase "then-current educational

placement."   The Ninth Circuit, however, has interpreted the phrase to mean "the

placement set forth in the child's last implemented IEP."   *Capistrano*, 556 F.3d at

902–03.   Here, because there is no dispute that Parents and the DOE have never

agreed on placement, Student has "never had an implemented IEP. . . . Therefore,

Parents' only viable argument for entitlement to 'stay put' is to construe the [2011

Appeal Order and subsequent 2012 Stay Put Order] as creating a 'current

educational placement' implied by law."   *Id.* at 903.   A post-placement

administrative or judicial determination can define the "current educational

placement" of a child.   "Where a parent unilaterally changes the placement of a

child, but a subsequent administrative or judicial decision confirms that the

21

parental placement is appropriate, the decision 'constitute[s] an agreement by the State to the change of placement' and the placement becomes the 'current educational placement' for the purposes of the stay put provision."   *K.D. ex rel. C.L. v. DOE*, 665 F.3d 1110, 1118 (9th Cir. 2011) (quoting *Clovis*, 903 F.2d at 641).   "However, such a favorable decision for a parent must expressly find that the private placement was appropriate."   *Id.* (citing *Capistrano*, 556 F.3d at 903–04).

The resolution of the Motion for Stay Put turns on whether Loveland is the current educational placement for Student within the meaning of 20 U.S.C. § 1415(j).   Plaintiffs contend that the 2011 Appeal Order by Judge Kurren was a judicial decision that confirmed the propriety of Student's educational placement at Loveland.   The DOE counters that Judge Kurren only assumed that Loveland was an appropriate placement for purposes of analyzing reimbursement, which is not tantamount to a determination on the merits that Loveland was the appropriate placement for purposes of stay put.   The Court concludes that in ordering reimbursement in the 2011 Appeal Order under 20 U.S.C. § 1415(i)(2)(C)(iii), Judge Kurren necessarily concluded both that the DOE denied Student a FAPE *and* that placement at Loveland was appropriate, regardless of whether the DOE argued

the issue of placement before Judge Kurren.    That placement determination also established Student's current education placement for stay put.

The DOE does not dispute that Judge Kurren ordered a reduced reimbursement to Plaintiffs after explaining the legal requirements governing that order; specifically, that "[a] court 'may grant reimbursement under § 1415(i)(2)(C)(iii) only when a school district fails to provide a FAPE *and* the private-school placement is appropriate.    The latter requirement is essential to ensuring that reimbursement awards are granted only when such relief furthers the purposes of the Act.'"    2011 Appeal Order at 33 (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242 (2009)) (emphasis in original).    The DOE argues, however, that an order of reimbursement does not equate to an express finding of appropriate private placement for purposes of stay put.    The DOE relies on a footnote in *Capistrano* to support its position.    566 F.3d at 904 n.1.    In that footnote, the Ninth Circuit explained:

> L.M. points to language in the district court's opinion indicating "the private in-home services . . . were appropriate, under the circumstances" to support his argument that the court did rule on the merits of his placement.    He takes this language entirely out of context.    In that section of its opinion, the district court addressed the right to reimbursement under section § 1412(a)(10)(c), which permits reimbursement if the child has received "some educational benefit."    The district court deemed the private placement "appropriate under the

23

> circumstances" only in the sense that L.M. had received some educational benefit entitling Parents to reimbursement for the one year for which they actually sought relief.   It has no bearing on the merits of the two programs for purposes of § 1415(j).

Id.   The 2011 Appeal Order, in conjunction with the 2012 Stay Put Order, is distinguishable from the situation in *Capistrano*.

Judge Kurren ordered reimbursement specifically under the framework of 20 U.S.C. § 1415(i)(2)(C)(iii), while reducing the amount of reimbursement pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii).   In order to award reimbursement under the § 1415(i)(2)(C)(iii) standard laid out by Judge Kurren (which differs from the § 1412(a)(10)(c) standard identified by the Ninth Circuit in its footnote in *Capistrano*),[3] Judge Kurren necessarily concluded *both* that there was a denial of FAPE *and* that private school placement was appropriate for Student.

The Court is aware that a determination of appropriate placement for purposes of reimbursement does not *automatically* equate to a current educational

---

[3]  The Court notes that the Ninth Circuit decided *Capistrano* prior to the Supreme Court's decision in *Forest Grove*, which clarified that reimbursement under § 1412(a)(10)(c) is subject to the requirements of § 1415(i)(2)(C)(iii) and held that "[p]arents 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act.'"   557 U.S. at 247 (quoting *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993)) (emphasis in original).

placement for stay put purposes.   *DOE v. C.B.*, 2012 WL 1081073, at \*5–6 (D. Haw. Mar. 29, 2012); *Huerta v. San Francisco Unified School District*, 2011 WL 5521742, at \*5–7 (N.D. Cal. Nov. 14, 2011).   However, beyond Judge Kurren's placement determination in the 2011 Appeal Order, which was necessary to award reimbursement, Judge Kurren also issued the 2012 Stay Put Order.   There, Judge Kurren unambiguously stated that "[t]he DOE does not dispute that Loveland was D.S.'s current educational placement after the Court's April 1, 2011 decision." 2012 Stay Put Order at 6.   Consequently, there is no lack of clarity with respect to, nor any need to imply, whether Judge Kurren intended the placement determination for reimbursement to also be a placement determination for stay put. *See Capistrano*, 556 F.3d at 904 ("Unless the district court or agency actually reaches the merits of the appropriate placement, [the reviewing court] will not imply a 'current educational placement' for purposes of § 1415(j) [(the stay put provision)].");  *cf. C.B.*, 2012 WL 1081073, at \*6 (remanding to the Hearings Officer because even though the Hearings Officer found the private placement to be an appropriate program for reimbursement, it was unclear whether that finding was intended as a determination of current educational placement for stay put purposes).   In short, even if the 2011 Appeal Order did not alone amount to a

placement determination for purposes of stay put, the combination of the 2011

Appeal Order and the subsequent 2012 Stay Put Order certainly did so.

Moreover, the fact that Plaintiffs were already granted stay put is, on

its own, an additional basis to grant stay put here.   "While the DOE is correct that

the case before [Judge Kurren was] not the same as the case before this court

because they deal with different IEPs, the cases are undeniably closely related and

arise from very similar facts.   Certainly the facts from which any court would

determine whether [Student] is entitled to a stay-put order are identical in both

actions."   *Marcus I. v. DOE*, 868 F. Supp. 2d 1015, 1021 (D. Haw. 2012).   The

current educational placement recognized in the 2012 Stay Put Order remains the

current educational placement for granting the current Motion for Stay Put, given

that there has been no change in the placement status of Student since the 2012

Stay Put Order.   *Marcus I.*, 868 F. Supp. 2d at 1022; *see Ashland Sch. Dist. v.

V.M.*, 494 F. Supp. 2d 1180 1183 (D. Or. 2007) (holding that the offer of new IEPs

does not alter the current placement for stay put).

Having concluded that Loveland is the current educational placement as a result of the 2011 Appeal Order and 2012 Stay Put Order,[4] the Court grants the Motion for Stay Put.

## **CONCLUSION**

Based on the foregoing, the Hearings Officer's August 31, 2012 Findings of Fact, Conclusions of Law and Decision is REVERSED.    Plaintiffs are the prevailing party in the Appeal.

Plaintiffs' Motion for Stay Put is GRANTED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAIʻI, November 14, 2013.



Derrick K. Watson
United States District Judge

D.S. v. DOE, CV 12-533 DKW/RLP; ORDER REVERSING ADMINISTRATIVE HEARINGS OFFICER'S AUGUST 31, 2012 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION AND GRANTING PLAINTIFFS' MOTION FOR STAY PUT

---

[4] The Court does not need to address whether any of the earlier settlement agreements created a current educational placement at Loveland.